## JANELLI v. JANELLI.
### No. 14017.

Court of Civil Appeals of Texas. Dallas.
Dec. 10, 1948.

Concurring Opinion Dec. 21, 1948.

Rehearing Denied Dec. 29, 1948.

Dissenting Opinion Jan. 11, 1949.

George Sergeant and Sarah Daniels, both of Dallas, for appellant.

White & Yarborough, of Dallas, for appellee.

BOND, Chief Justice.

This is an appeal from an interlocutory order of a District Court of Dallas County, in limine, temporarily restraining the defendant "from selling or disposing of or encumbering any of his real or personal property wherever located" pending a suit brought by plaintiff against the defendant; and, incidentally, for the defendant to file inventory of his property on or before the date mentioned in the order. The injunctive writ was directed to be issued upon plaintiff's executing a temporary injunction bond in the sum of $1,000 in terms of

law, payable to the defendant. The defendant excepted to the judgment and gave notice of appeal; whereupon the trial court fixed amount of supersedeas bond at $5,000 which was duly posted, thus perfecting the appeal to this Court.

The defendant predicates his appeal upon two points of error germane to appropriate assignments of error: (1) Where plaintiff can show no marriage to defendant, she does not, in suing him for a divorce, have the right to require him to file an inventory of his property; and (2) the burden of proof is upon the party seeking a temporary injunction, and where the plaintiff is unable to show a marriage existing between herself and the defendant, she is not entitled to an order enjoining defendant from his free use, management and disposition of his property. It will be seen that the controlling issue presented in both points of error is that there was no marriage existing between the plaintiff and defendant; hence on that controlling feature hinges a determination of plaintiff's right to the interlocutory orders presented in this appeal. Manifestly, if there was no marriage, there can be no divorce; hence suit is a nullity.

■ The validity or existence of the marriage relation is obviously the substructure upon which a divorce action depends. It is jurisdictional. In divorce suits, as well as all interlocutory orders made in relation thereto, where the existence of marriage is the basis of the action, plaintiff must prove as well as plead the existence of such marriage. And in the absence of such pleadings or proof the plaintiff is not entitled to maintain the suit; nor the trial court make orders incident thereto. "A marriage is a mutual agreement of a man and woman to live together in the relation and under the duties of husband and wife, * * *." Lewis v. Ames, 44 Tex. 319, per Roberts, C. J. The relation growing out of putative marriage is not that of husband and wife; there must have been an actual contracting or agreement for the marriage and a consummation of the marriage by statutory formalities, or by common-law union. Marriage differs from concubinage in that the intent in the former is to agree to assume the relation of husband and wife, whereas the intent in the latter is to assume no such relationship. Marriages, as well as divorces, being of vital public interest, the law fixes and regulates marital relation on public consideration, justifying proof of such relation to be clear, unambiguous and satisfactory, before a judicial tribunal shall decree such relationship and deprive one of his personal property rights.

■ Plaintiff's suit is merely in form of divorce, alleging that "she and the defendant were lawfully married to each other on the 6th day of November, 1939, in Dallas County, Texas." The defendant in reply alleges that "Ella Pennington, who in this suit styles herself Ella Janelli, was never married to him and that no marriage relation exists or has ever existed between them." Thus the issue joined; and, the burden being on the plaintiff to prove the marriage, before any order may be made in reference thereto, we conclude that the plaintiff has wholly failed to meet the burden; that the evidence here presented conclusively shows that the parties were never married or held themselves out as husband and wife.

■ It is not clear from plaintiff's pleadings whether she relies upon ceremonial marriage or a common-law marriage; but in either event the evidence of such is wholly lacking for the court to proceed upon a valid marriage existence to create rights and liabilities in reference thereto. The only testimony in support of plaintiff's allegation is that of plaintiff herself, who testified that she and defendant were married on Sunday morning, November 6, 1939, at Eleven o'clock, in the defendant's room at his home, by a Reverend Smith whom she did not know, or had ever seen; she did not know the preacher's initials, his religious sect or the church of which he was pastor. She stated that on that occasion, the defendant had already secured a marriage license, unbeknown to her; she didn't know when or where it was issued nor whether the preacher returned it to any county clerk's office for recordation; she had never made inquiry at the county clerk's office of Dallas County, in which county both she and defendant had lived the greater portion of

their lives, to ascertain whether or not such marriage license had been issued or recorded. She further testified that no one witnessed the marriage ceremony other than herself, the defendant and the preacher; she did not tell her family she was going to marry; she did not know it herself until they got near the defendant's home on the occasion mentioned; that they stayed a little while at the house after the ceremony and then went out driving; that she and defendant never lived together,—she lived at 3409 Osburn Street and the defendant lived at 1413 Pennsylvania Street in the City of Dallas; that after his mother died (1943) he moved into another house he owned and lived with a widow and two children at another location on Peabody Street; that during all this time she was living with "a bunch" of her nieces and nephews and her own children by her first marriage (to a Mr. Pennington); that defendant never stayed at her home and she never stayed at his home, except one time when the widow at his home went out to West Texas. She further testified that during all this time the defendant had been going and keeping company with other women. She further testified that in July 1947 she purchased a lot and built a house on it in name of Ella Pennington; executed deferred payment notes as Ella Pennington; paid it out in installments, and in June 1948 secured a $3,000 mortgage loan, executing a note as Ella Pennington to Metropolitan Loan Company; that she had been working for Lorch Manufacturing Company in Dallas for about fifteen years in name of Ella Pennington, a single woman; that she carried the name "Pennington" in all her dealings, executed withholding Federal tax reports in that name and reported to her employer daily slips of her work as a single woman; that she never signed a joint income tax report with the defendant; that she owned two houses in Dallas, insured in her name, as Ella Pennington, and had a fire loss on one of the houses and collected for the damage in name of Pennington.

The only testimony offered by plaintiff corroborative of her own testimony, was that of her daughter-in-law Bessie Irene Pennington, and her daughter Gladys Pennington. Irene testified that she had been in the home of plaintiff when the defendant was there and that in the year 1942 she heard the defendant say that he and the plaintiff were married; that she lived across the street from plaintiff and had seen the defendant come and go, but never making it his home; that from November 6, 1939 to November 1942, she had never heard of any marriage existing between the plaintiff and defendant; that the only thing he said was in 1942,—"he was married to her sometime in November 1939." Gladys Pennington testified that in the summer of 1942 she was living with her mother, and after dark she suddenly opened the door to her home and saw the defendant disrobed, in the presence of her mother; witness said "I was shocked. He said it was all right because they were married. 'Its my wife, Ella.'" She gave no further testimony that she had ever heard of such marriage before that occasion, although she had been living with her mother and had been out with them frequently.

The defendant categorically denied that he had ever been married to the plaintiff or anyone else; that he had ever procured a marriage license or seen any preacher as related by plaintiff, or ever said that they were married. Testified that he had never lived with plaintiff at any time or place and had no right to do so; that he has been in Dallas for about forty-two years, living with his mother on Pennsylvania Avenue; that he was 57 years of age; had known Ella Pennington for about sixteen years; she was single when he first knew her,— she was Ella Pennington; afterwards, in 1938, she married a man named Wichmann and later married a man named Alcorn. O. K. Crossett, Deputy Clerk, identified the marriage license records of Dallas County and testified that no license had ever been issued to either the plaintiff or defendant. Mrs. L. T. Crosson, sister of the defendant, testified that in November 1939, and for many years prior to and after said date, she and her husband lived in the same house with the defendant; that in November 1939 she and her three children were continuously at home in the room adjoining that of the defendant, and

that she knew nothing about a wedding then or at any other time, either personally or by repute. She further testified that her mother lived for many years, until her death in 1943, in the room on the other side of defendant's room, and was there continuously throughout November 1939. Defendant then offered in evidence the calendar for 1939, showing that November 6, 1939 was on Monday and not on Sunday; also introduced employee's withholding exemption certificate bearing date November 13, 1944, signed "Ella Pennington" and reciting therein that she was not married—a single person; also her employer's work sheet, bearing the name of "Ella Pennington" as its employee.

Against the foregoing statements and evidence of the plaintiff, is the testimony of an array of witnesses: Four neighbors of the defendant who had known him from his boyhood and had been thrown with him continuously up to the time of trial, testified that he was not married; had never been married and had lived as a single man during all of such period. They stated that they had heard of the lawsuit, and, without objection, related that they regarded it as an outrageous and iniquitous proceedings against a good and honorable man.

There being no ceremonial marriage established by proof worthy of probate force, we turn to the record as bearing on common-law marriage. To constitute a common-law marriage, three elements must exist and must be shown by the plaintiff upon whom rests the burden of proof: (1) There must be an agreement to become husband and wife; (2) a living together pursuant to the agreement, and (3) a holding out of each other to the public as husband and wife. Berger v. Kirby, 105 Tex. 611, 153 S.W. 1130, 51 L.R.A., N.S., 182; Martinez v. Martinez, Tex. Civ.App., 6 S.W.2d 408; Bell v. Southern Casualty Co., Tex.Civ.App., 267 S.W. 531. "The cohabitation must be professedly as husband and wife, and public, so that by their conduct towards each other they may be known as husband and wife." Winters v. Duncan, Tex.Civ.App., 220 S.W. 219, 221. In Bargna v. Bargna, Tex.Civ.App., 127 S.W. 1156, 1160, the San Antonio Court of Civil Appeals, speaking through Justice Neill, said: "But such a contract, we think, should, in view of the sacredness of the relation and its importance to society of which it is the chief cornerstone, be satisfactorily proved. Consent, not living together in concubinage, constitutes marriage."

The evidence and record above related, recited substantially in appellant's brief and not challenged by the appellee, may be accepted as correct. (Rule 419, Texas Rules of Civil Procedure.) And, in addition thereto, evidence which we accept as correct clearly shows no common-law marriage. Mrs. Irene Tompkins, who had rented quarters from defendant and lived in the same house where he lived from April 15, 1945 to the present, testified that he had lived alone in his own home during all of such period; that plaintiff had not lived there with him. Phil Kaufman testified that he had handled plaintiff's fire insurance over a period of years and that all of her insurance policies with him had been in name of Ella Pennington and that she now has an insurance policy on 3221 South Boulevard, taken out on January 6, 1948, in the name of Ella Pennington. M. D. Blackburn of Stewart Title Company, Dallas, testified that he had a business transaction with the plaintiff early in 1948, in which he handled for her the renewal of a debt on some of her property; that it was handled in the name of Ella Pennington; and added: "In dealing with Mrs. Pennington from time to time she had always represented herself as a widow." Mrs. John Kelly Hook, a bank clerk in the South Dallas Bank & Trust Company, testified that: "Mr. Janelli brought Mrs. Pennington to me to see about a loan for her son on a Sunday morning between the first and ninth of November, 1947"; that Mr. Janelli introduced her as "Mrs. Pennington"—a friend of his. She further testified: "Mrs. Pennington said that she was a friend of Mr. Janelli's, they were quite good friends, that they would probably never marry because Mr. Janelli's mother had objected during her lifetime and now Mrs. Pennington's children were so opposed to it, but that they were quite good friends, and she asked him to take

.. 

her to my home so she could get some information that I couldn't give her * *."

Mrs. Esther Rubinstein testified that she was the office manager for Lorch Manufacturing Company; that plaintiff had worked there since 1931; that she had never gone under the name of Janelli, but that her name on the rolls of the Company from 1939 continuously to the present was Ella Pennington. She further testified that the withholding and social security tax statements showed plaintiff as Ella Pennington, a single woman.

We think a common-law marriage is refuted by the facts and circumstances in evidence and that a marriage did not exist as a basis for plaintiff's suit. The whole face of the record is open to the suspicion that the plaintiff instituted her suit, not so much for the purpose of obtaining a divorce, but as a device for obtaining interest in and title to defendant's property, thus inflicting on him expenses of litigation against the furtherance of such sinister aim.

■ We are not unmindful of the rule that if there is any probative evidence to support the judgment of the trial court, appellate courts should not disturb the judgment. But the exception is that where the judgment is against the overwhelming weight of the evidence, tantamount to no evidence, Courts of Civil Appeals must set aside the judgment. The Texas Constitution, Art. 5, sec. 6, Vernon's Ann.St., and the Enabling Act of the Legislature, Art. 1820, R.S., provide that the decisions and judgments of Courts of Civil Appeals shall be conclusive in all cases on the facts of the case. Thus we conclude the evidence insufficient to sustain the action of the trial court in granting the harsh restraining and mandatory orders in reference to defendant's separate property, in which the plaintiff is shown to have no right, title or interest. It will be seen from the record here, that, at the threshold of the hearing, the trial court admonished the litigants. We quote: "I am not going to decide the question of whether or not these people are married, but I am going to decide whether or not there is enough evidence to justify, in truth and in fact, a temporary restraining order that some judge has issued for this court, * * * that he is going to hear the injunction and the question of inventory, but was not going to pass on the marriage." Hence, the basic element, the marriage, upon which the court could have made the temporary orders, not having been determined, the court orders are void.

■ The plaintiff in brief makes cross-assignments of points of error that plaintiff's suit being a "divorce suit," and the interlocutory orders (object of this appeal) having been made ancillary to a "divorce suit," no appeal lies perforce of Art. 4635 and Art. 4636, Vernon's Ann.Rev. Civ.Sts. The brief cites the adjudicated cases of Beckler v. Beckler, Tex.Civ.App., 114 S.W.2d 618; Dakan v. Dakan, Tex. Civ.App., 53 S.W.2d 682; Roosth v. Roosth, Tex.Civ.App., 181 S.W.2d 974; Bean v. Peurifoy, Tex.Civ.App., 74 S.W.2d 126; and it may well have cited Dyer v. Dyer, Tex.Civ.App., 87 S.W.2d 489, opinion by this Court. In those cases the Courts of Civil Appeals were dealing with "divorce suits" in which there was no controversial issue as to whether there was a marriage. Where marriage is shown, a presumption arises that its status is in existence until legally terminated by death, or by a court of divorcement,—indeed a "divorce suit." "Divorce" means, primarily, the dissolution by law of the marital relation, and presupposes the existence of a valid marriage; and where there exists no valid marriage, the "divorce suit" is a nullity. Reese v. Reese, 128 Kan. 762, 280 Pa. 751; Dodds v. Pittsburgh, M. & B. Rys. Co. etc., 107 Pa.Super. 20, 162 A. 486. In a divorce suit the action of the court proceeds upon the proof that a valid marriage existed and created rights and liabilities; it dissolves marriage contracts. The phrase "cases of divorce" within the statute making jurisdiction of the Courts of Civil Appeals final in such cases, refers to "divorce actions" which include dissolution of bonds of matrimony and the determination of property rights. Art. 1821, Vernon's Ann.Civ.Sts.; Burguieres v. Farrell, 126 Tex. 209, 87 S.W.2d 463; Kellett v. Kellett, 94 Tex. 206, 59 S.W. 809. In McDade v. McDade, 16 S.W.2d 304, 305,

the Texarkana Court of Civil Appeals said: "In view of the classification for judicial decree as made by the statute, the term 'suit for divorce' as used in article 4631, was intended to specifically relate and have application only to the same class of actions denominated 'divorce' in the meaning of divorce of a valid marriage for causes arising after marriage." In the case of Grant v. Grant, 286 S.W. 647, 650, the Fort Worth Court of Civil Appeals said: "* * * when rights are asserted and based upon an alleged common-law marriage, the courts will scrutinize the relation of the parties closely. The requirements of a common-law marriage need not be discussed nor determined in this opinion, but reference to the cases will show that they are strict." See 18 R.C.L. p. 383.

■ So, in the case at bar, the action for divorce for statutory cause is merely incident to and dependent upon the existence of a marriage, either statutory or common-law union, there can be no "divorce suit," to dissolve that which does not exist; and never did exist between the parties. The nature of the suit must be shown to mean what it is, as shown by the pleadings and substantial proof, and not that which is doubtful and uncertain. A suit merely denominated a "divorce suit," which is lacking in essential elements, is not such a suit as to deprive an aggrieved party of his right of appeal, where, as in this case, the proof shows unmistakably that the suit is other than a divorce from bonds of matrimony. Art. 4636, R.S., reads: "Pending suit for a divorce the court, or the judge thereof, may make such temporary orders respecting the property and parties as shall be deemed necessary and equitable." This court, in Dyer v. Dyer, supra [87 S.W.2d 490], said: "The pendency of a suit for divorce *and the existence of a marriage, therefore, are essential elements to the exercise of this broad discretionary power of the court.*" (Italics here supplied.) It follows that the non-existence of a valid and subsisting marriage, as a matter of reason, the court may not exercise the statutory power in granting temporary orders to deprive one of the use of his property rights. It, therefore,

is basic that marriage must be proved, and, having been proved, must be concurred in by the trial court that a valid and subsisting marriage exists between the parties, before the court or judge is authorized to make statutory orders as provided by law. The plaintiff is not authorized to maintain suit for property rights under guise of a divorce action.

We think, under this record, appeal lies to this Court, the judgment of the lower court should be reversed and the cause remanded to that court with direction to set aside its orders granting the temporary injunction and ordering defendant to file inventory of his property; and, on further hearing, if the evidence presented should not be materially different, as disclosed in this appeal, on the issue of marriage, the suit should be dismissed. It is so ordered.

Reversed and remanded with instructions.

LOONEY, Justice (concurring).

I concur in the decision of the case as announced by Mr. BOND, Chief Justice, also in the conclusion reached on the pivotal issue involved, that is, that marital relations did not exist between the parties. A suit for divorce necessarily is based upon the existence of a valid marriage, and where such does not, in fact, exist, it follows as night the day that the party filing the proceedings would not be entitled to either of the incidental interlocutory remedies provided by Arts. 4635, 4636 or 4637, 13 Vernon's; also same Arts. R.C.S.

At the threshold of the proceedings below, the appellant denied that he and appellee were ever married, or that their relation was that of husband and wife. After a lengthy hearing, the trial judge declined to specifically decide the question of marriage, but granted the interlocutory relief provided by Art. 4635; that is, required appellant to file an inventory of his real and personal property and enjoined him from disposing of any part thereof in any manner, from which he prosecuted this appeal and assigned error.

In the course of the opinion Mr. Bond, Chief Justice, discussed both theories in

regard to the existence of a marriage; that is, marriage as authorized by statute, also a common-law marriage. I do not think the issue of common-law marriage is in the case, for the reason that appellee in her description of the marriage places it upon the basis of a ceremonial marriage by a minister, under a license issued. However, that, in my opinion, is an immaterial matter so far as the main decision is concerned.

Our attention has not been called to any Texas case in point, but cases from the courts of other States seem to be rather numerous. In 1 R.C.L. (Title Alimony), pp. 898–899, sec. 44, it is said: "Proof of Marriage Generally. As the existence of a valid marriage is the very basis on which a grant of temporary alimony is founded, an allowance pendente lite should not be made, where the husband denies the existence of the marital relation, until the dispute thus raised as to the status of the parties is determined. To raise the issue of marriage, however, an answer denying the same must be actually interposed, for if, prior to the filing thereof, it is used merely as an affidavit to contest the application, it is not sufficient to raise the question. * * *" In 17 Am.Jur., p. 436, sec. 541, the rule is announced that: "The existence of a valid marriage is the very basis on which a grant of temporary alimony is founded, and an allowance pendente lite should not be made, in the absence of statute where the husband denies the existence of the marital relation, until the dispute thus raised as to the status of the parties is determined. * * *." (Citing authorities from several states.) And in 19 C.J., § 495, page 203; it is announced that: "* * * Lawful intermarriage necessary. The common-law use of the term 'alimony' restricted its application to allowances made by and to persons between whom there had been a lawful intermarriage, and careful legal definitions so describe it. * * *." See also 27 C. J.S., Divorce § 202. Also, 19 C.J. § 512, on page 212, the same doctrine was announced as follows: "(Sec. 512) c. Marriage. (1) In General. Marriage being the essential foundation of allowances for alimony, the existence of a marriage be-

tween the parties must be admitted, or shown, before a decree or order properly can be made for an allowance of temporary alimony." See also 27 C.J.S., Divorce, § 208. (Citing authorities from more than twenty States of the Union.)

While the authorities cited above relate exclusively to the rule applicable where alimony is allowed, I think that the rule applicable in alimony cases necessarily would be equally applicable in cases where other incidental relief is granted, such as in this case, in that, the statute cited above authorizing the allowance of alimony is in same category with other statutes authorizing incidental, interlocutory, nonappealable relief in divorce cases.

Appellee's account of her marriage to the appellant and the unbroken tenor of their lives for about nine years since, being same as previously, is so unusual, fanciful, and grotesque, as, in my opinion, to be an unreliable guide to the truth and without probative value.

Appellee's testimony is to the effect that she went to appellant's bedroom one Sunday morning, giving date (calendar shows the day was Monday); there she found a minister by the name of Smith—a stranger to her—who had a marriage license, but where, when or by whom issued she failed to show; although the marriage records of Dallas County, where these parties had made their homes and resided for many years, and where, naturally, such a license would have been issued, failed to reveal any evidence of the issuance of a license authorizing the marriage of these parties. She further testified that after the marriage they took a ride; went to church; thereafter separated, appellant going to his room and appellee back to her home; and never for one day did they live together as husband and wife, or did they hold themselves out as husband and wife. Her closest friends and nearest neighbors did not know of, nor had they ever heard of the reputed marriage. After the reputed marriage, just as before, she acted as a feme sole in all business transactions and social relations in the name of Pennington, being the name of her first husband. Although she testified they had never lived together, said they had certain

contacts, meetings and cohabitations; that one night when appellant's housekeeper, a Mrs. Tompkins, and children were absent visiting relatives, appellee spent the night with appellant in his room. She also testified that on several occasions she and appellant visited her relatives who resided in Hopkins County, Texas, and on such occasions they occupied the same room and bed. However, one of her nephews, Aubry Blunt, at whose mother's home the parties spent one night, contradicted appellee, stating that on that occasion they occupied separate rooms and separate beds; that witness spent the night in same room with the appellant, sleeping on a divan whilst appellant slept in a bed. Appellee's daughter who lived with her mother, testified that on one occasion about three years after the reputed marriage she opened a door in her mother's home and was shocked to see appellant in the room, disrobed in the presence of 'witness' mother, and that appellant explained to witness that he and her mother were married. Of course it would be natural for one discovered in such an embarrassing situation to make some plausible explanation.

Appellant categorically denied all this testimony; denied that at any time or place he had the contacts and intimacies with appellant to which she testified. But I am of the opinion that, even if it be true, in view of the bizarre case made out by appellee it is more reasonable to conclude that these secret, clandestine and infrequent meetings and intimacies were due to the irregular and improper living of the parties, rather than that they were the indulgencies and intimacies of husband and wife.

YOUNG, Justice (dissenting).

To my mind the majority conclusions are without precedent. In the first place, the matters before us involve interlocutory orders made by the trial court during pendency of a divorce suit under Art. 4636, Vernon's Ann.Stats., hence not appealable; and this Court should have sustained appellee's motion to dismiss the cause for want of jurisdiction. The following excerpt from Beckler v. Beckler, Tex.Civ. App., 114 S.W.2d 618, 619, is illustrative of the consistent holdings of our courts on nonappealability of such temporary orders as may arise under title 75, ch. 4 on Divorce; the appeal there being from an order restraining defendant from encumbering or disposing of community property (Art. 4635): "The motion to dismiss the appeal must be sustained. * * * The right to appeal from an interlocutory order must depend upon the statute conferring such right. Pittman v. Byars, 100 Tex. 518, 101 S.W. 789; Bean v. Peurifoy, Tex. Civ.App., 74 S.W.2d 126; Dupree v. Davis, 116 Tex. 405, 292 S.W. 523; Dyer v. Dyer, Tex.Civ.App., 87 S.W.2d 489; Shultz v. Shultz, Tex.Civ.App., 28 S.W.2d 223. Our only statutory provision for an appeal from an order granting a temporary injunction is article 4662 of the Revised Civil Statutes. That article is a part of title 76, article 4642 et seq., and expressly limits the right of appeal to injunctions granted under any provision of 'this title.' Necessarily, in such a connection, 'this title' means title 76. The provision conferring upon the wife the right to an injunction restraining the husband from disposing of 'real and personal estate during the pendency of a suit for divorce is article 4635, which is a part of title 75, article 4602 et seq., and, therefore, not affected by article 4662." See also Dakan v. Dakan, Tex.Cix.App., 53 S.W.2d 682 and authorities there cited.

But we may pass for the moment any question of appealability. Error inherent in the prevailing opinion goes deeper and is fundamental. It is not within the province of an appellate court to *pass upon the merits* of an action on appeal from an interlocutory order, nor to consider any matters which do not relate to the propriety of the order appealed from. 3 Tex.Jur., p. 1019; City of Fort Worth v. Invader Oil & Refining Co., Tex.Com.App., 238 S.W. 206.

On July 8, 1948, plaintiff filed a sworn petition for divorce against defendant, alleging a cause of action; praying for, during pendency of suit, the temporary relief provided for by Arts. 4635 and 4636, ch. 4, title 75, Vernon's Ann.Sts. On July 16, after a hearing, such ancillary relief was granted, consisting of an order for inventory, temporary restraint against the alleged husband both with reference to the alleged husband

communicating with plaintiff and from selling, encumbering or disposing of his real or personal property "during the pendency of the suit." At the hearing, Judge Bush advised counsel that he was there merely to decide whether, under the evidence, plaintiff was entitled to the relief sought, with no final determination on the controlling issue of marriage. Plaintiff then testified to the fact of marriage, date, circumstances, etc., with daughter and daughter-in-law in corroboration as to admissions against interest made by defendant in 1942. At close of all testimony the orders hereinabove mentioned were made.

At such juncture (eight days after filing of suit and jury called for) this Court proceeds to try the ultimate issue just suggested, holding that the testimony adduced on behalf of plaintiff was tantamount "to no evidence" at all and that the record "here presented conclusively shows that the parties were never married or held themselves out as husband and wife." The majority cannot thus finally adjudicate the merits of a cause of action as an incident to the disposition of a preliminary order. I have been cited to no principle of law or authority in support of the particular procedure, depriving plaintiff, as it does, of her constitutional right of trial by jury. It is well settled that on interlocutory appeals, such as from the grant or refusal of a temporary injunction, our power extends no further than to pass upon the trial court's discretion, whether abused or not, with no authority to rule upon the weight or sufficiency of testimony. " * * * If the order was based on conflicting evidence or diverse inferences it will not be disturbed. The evidence is not reviewed for sufficiency as it would be upon appeal from a final judgment, but only to see if it supports the court's exercise or discretion." 24 Tex.Jur., sec. 253, p. 314. Scanlan v. Houston Lighting & Power Co., Tex.Civ. App., 62 S.W.2d 537, Writ refused; Kilburn v. Childers, Tex.Civ.App., 86 S.W.2d 832.

The rule just quoted is clearly applicable to the intermediate judicial action contemplated by Art. 4635 et seq. of our divorce laws. Art. 4636 merely requires a "pending suit for a divorce" as a prerequisite for the

temporary relief there furnished; complainant becoming entitled thereto almost as a matter of right by the simple filing and presentation to a court or judge of a verified petition for divorce, in which such orders are requested. At least this Court has so held. Mowers v. Mowers, Tex.Civ. App., 32 S.W.2d 1118, contains the following language: "Appellee's petition alleges a valid common-law marriage, legal grounds for a divorce, and prays for a partition of the community estate. It also contains allegations *duly verified sufficient, in substance, to warrant the action of the court in issuing the temporary writ of injunction.*" (Emphasis mine.) In Wright v. Wright, 3 Tex. 168, sections 6, 9 and 10 of the 1841 Laws, p. 21 (almost identical with present Articles 4635, 4636 and 4637) were under consideration and Chief Justice Hemphill had this to say: "These and other provisions of the statute show clearly that, in the contemplation of the Legislature, the rights of the wife might be endangered during the progress of the suit; and full powers are vested in the court to make all their orders and issue such writs as may be necessary for their conservation. The terms are emphatic, that the wife may require an injunction restraining the husband from the disposition of any part of the property in any manner, and it would seem to be imperative on the courts to issue such writ whenever it may be demanded by the wife. *From the language employed, if construed literally, it would appear that but little discretion can be exercised in determining upon the application, and that the writ, when desired, would be one of right, and would issue almost as a matter of course."* (Emphasis mine.)

The Legislature, in my opinion, has considered the actual pendency of a sworn petition for divorce as a sufficient warranty of good faith; and the immediate relief provided under the named articles follows, ipso facto, in order that a probable judgment upon final trial be not rendered ineffectual.

Appellant's only answer to the instant petition for divorce is that there has never existed a valid and subsisting marriage. This court, in Dyer v. Dyer, Tex.Civ.App., 87 S.W.2d 489, 490, expressly recognizes

that such was a defensive plea for adjudication on trial to the merits. There, to petitioner's prayer for temporary injunction, alimony, etc., defendant interposed the defense of final decree of divorce theretofore obtained in the State of Nevada. Speaking through Chief Justice Bond, we there held: "The crux of this controversy is the validity of a divorce decree granted to the defendant in a district court of the state of Nevada. This controversy is determinable on *final trial to the satisfaction of the court;* thus the temporary injunction, preserving the property in status quo and impounding a portion of the defendant's salary and releasing the balance to the needs of the defendant, is clearly made to abide the ultimate determination of the issues evoked in the divorce suit. It follows, therefore, that, if it should be determined ultimately that there exists no marriage, then no right to the plaintiff exists in the impounded funds; on the other hand, if it should be determined that there exists a marriage between the parties and the divorce decree of the foreign state availeth nothing, then the right to the fund may be determined as the court may deem necessary and equitable between the parties; and, on a pronouncement of a decree of divorce, order a division of the estate of the parties in such a way as the court shall deem just and right." (Emphasis mine.)

I am not unmindful of the fact that, through a three hundred eighty-three page statement of facts, defendant here offers the strongest possible testimony in support of his plea. But he will have time enough after suffering an adverse judgment (if he does) in which to make an orderly appeal to this Court where the point can be raised of no evidence to sustain it, or that the jury verdict was so overwhelmingly against a preponderance of the evidence as to be clearly wrong.

Through this voluminous record, as already observed, appellant has indeed made out an impressive case. He argues that there is no right without a remedy, and unless resort may be had to Art. 4662 (providing for an appeal from a temporary injunction) and the controlling issue of marriage accorded a trial in limine, "no

single man is safe from suit by a designing woman." This writer (who is no benedict) has an interest like unto that of defendant in having duly safeguarded a status common to us both. However, if placed in a similarly unfortunate position, I would not feel without adequate remedy. The trial court has ample authority to order a severance and separate trial on any plea in bar, and to render judgment solely on the issue tried and found to be decisive of the case. Rule 174(b) reads: "The court in furtherance of convenience or to avoid prejudice may order a separate trial of any * * * separate issue * * * or issues." By recourse to the foregoing rule appellant would have been afforded an orderly trial to a jury on his plea in bar well within the time already consumed by this premature adjudication of ultimate issues. Appellee's motion to dismiss for want of jurisdiction should have been sustained.